| 27 | 709 |
| 28 | 135 |
| 28 | 337 |
| 29 | 307 |
| 27 | 769 |
| 35 | 132 |

No. 6321.

LEO CAHN v. THE STATE.

1. PRACTICE—ORGANIZATION OF PETIT JURY.—The record shows that of the sixty jurors drawn on the special venire (the trial being for a capital felony) but fifty were served, and that of the fifty served but thirty-three were present at the organization of the trial jury. The defendant moved the court that, before he be required to proceed with the selection of a jury from the thirty-three veniremen present, he be awarded process to compel the attendance of the absent seventeen veniremen who had been served. The trial court overruled the motion, the defendant excepted and moved that he be awarded either compulsory process for the said absent veniremen who had been served, or a postponement of the trial until their presence could be secured. The thirty-three veniremen who were present were then examined on their *voir dire,* and of their number four were impaneled on the jury, and the court ordered a special venire for talesmen, returnable instanter, to which action of the court the defendant excepted, and again moved for compulsory process for the seventeen absent veniremen who had been served, which exception and motion were overruled. The defendant then moved that before requiring him to select a jury from talesmen, the court should call and tender him the regular panel of jurors drawn for the week by the jury commissioners; which motion was also overruled. *Held,* that in each of the said rulings the trial court erred.

2. DYING DECLARATIONS—PREDICATE.—As a predicate for the introduction of the dying declarations of the deceased, the State proved that when he made the declarations the deceased was sane, was conscious of impending death, and that he made the said declarations volun

tarily and not in answer to questions calculated to lead him to make any particular statement. *Held*, that the predicate was sufficient.

3. PRACTICE—EVIDENCE.—A State's witness testified that he arrested the defendant on the day of the shooting and near where it occurred, but was unable to state what length of time had elapsed since the shooting occurred. The defense, on cross examination, proposed to prove by the witness the statement made to him by defendant, when arrested, about the shooting. The proposed proof was excluded as no part of the res gestæ. *Held*, correct.

4. SAME.—The testimony of the defense tends to show that about the time of the fatal shooting the defendant claimed that the deceased was indebted to him a sum of money. It also shows that the employment of the defendant as the business manager, bookkeeper and confidential agent of the deceased terminated in June, 1887. In rebuttal of the defendant's claim of money due him by the deceased, the State introduced in evidence, over objection of defendant, a promissory note executed by the deceased in favor of the defendant, dated June 2, 1887, which showed by defendant's indorsement to have been paid, and also a receipt, executed on the same day by the defendant, acknowledging the payment in full by deceased of all claims then due. *Held*, that the trial court did not err in admitting the said note and receipt in evidence.

5. SAME.—During the progress of the trial the defendant's counsel requested permission of the court to consult a State's witness with reference to the testimony he would give in the case. The court granted the request, but the witness refused to disclose his testimony to the counsel, and the latter moved the court to compel the witness so to do. The court refused the motion, and the defendant excepted. *Held*, that the ruling was not error.

6. MALICE—CHARGE OF THE COURT.—As a general definition of malice, the trial court instructed the jury as follows: "Malice means a settled purpose or intention to seriously injure or destroy another." *Held*, erroneous.

7. SAME.—In view of the evidence, the trial court erred in omitting to instruct the jury that, if defendant provoked the contest with deceased, but not with the intention of killing or doing him serious bodily injury, he would not, by such provocation, be wholly deprived of the right of self defense, but that in such case self defense might be availed of by him to the extent of reducing the degree of homicide to a grade less than murder.

8. SAME.—See the statement of the case for special instructions which, in view of the evidence, were erroneously refused by the trial court.

9. PRACTICE—TRANSCRIPTS ON APPEAL.—See the opinion for suggestions of this court to trial courts and counsel with regard to the preparation of transcripts for appeal.

APPEAL from the District Court of Dallas. Tried below before the Hon. R. E. Burke.

The indictment in this case was filed on the thirteenth day of April, 1888. It charged the appellant with the murder of M. Benedikt, in Dallas county, Texas, on the twenty-second day of March, 1888. The trial, which was had at the February term, 1889, of the district court of Dallas county, resulted in the conviction of the appellant for murder in the second degree, a term of ten years in the penitentiary being the penalty assessed against him.

Doctor G. E. Peters was the first witness for the State. He testified, in substance, that on the twenty-third day of March, 1888, he was summoned, in his professional capacity, to the store of M. Benedikt & Co., on the southwest corner of Elm and Poydras streets, in the city of Dallas, Texas. Near the head of the stair case, in the rear room of the second story, the witness found Mr. Benedikt, whom he had not hitherto known, lying on the floor, suffering from a gun shot wound in the back of the neck. The ball struck about one inch to the left of the medium line of the neck, passed upward and slightly forward, and struck the posterior portion of the bone known as the "atlas," which is the first bone of the spinal column on which the skull rests. From the said bone the ball deflected downward and lodged in the soft part of the neck, about an inch below the "atlas." The first effect of such a wound would be a severe shock and concussion; then, on even a slight motion of the head, death. Its instantaneous effect, the witnes thought, would be to knock a man down, and Benedikt, in this instance, must have fallen as soon as shot. Witness reached Benedikt within fifteen minutes after he was shot, at which time Benedikt was partially conscious. With the exception of the few minutes devoted to his dinner, the witness remained throughout that afternoon with the wounded man. Benedikt recovered his consciousness after the witness reached him, and awakened to a full realization of his condition. He said repeatedly that he was dying—that he was virtually a dead man. He made a statement about the shooting at various times before his death, at which times he was perfectly sane, and realized the mortal nature of his wounds. His statement so made was voluntary, and was not made in answer to any questions propounded by anybody, calculated to lead him to make any particular statement. (Touching the mental condition of the deceased at the time he made the declarations about to be proved by the State, this witness, and all others who testified thereto, were sub-

jected, by the defense, to an exceedingly rigid cross examination, which, however, in view of the ruling of this court on the question of predicate, it is not necessary that this report should follow. And it may be here remarked by the Reporters that the statement of facts, which covers two hundred and forty-four pages of the record, is colloquial in form and appears to be a literal transcript of a stenographic report of the proceedings on the trial. In reducing the testimony of the witnesses to the narrative form, in order to compress it within reasonable limits, details must be sacrificed to the succinct statement of the material facts proved.)

Continuing his testimony, the witness said that the first remark made by Benedikt, after witness reached him—and he was then lying on the floor—was: "I am a dying man." He repeated those words at short intervals until he was placed on a box, and repeated them several times after he was placed on the box, and in connection with his repetitions of those words after he was placed on the box, he several times said: "He shot me! Cahn shot me! He said: 'I must have money; I am desperate, and unless you sign these papers I will kill you. I have come prepared to kill you unless you sign these papers.'" These repeated statements were made on Friday afternoon, being the afternoon of the day on which the shooting occurred, and they were reiterated, in substance, while witness was present on Saturday and on Sunday morning. He died about noon on Sunday. After deceased made the said statement the first time, on Friday evening, the witness asked him where he and the deceased were at the time of their conversation preceding the shooting. He replied: "In the front room."—which would be the room fronting on Elm Street. The witness then asked him where he was when he was shot. He replied that he was running. The wound in the neck of deceased was necessarily a mortal wound, and was the cause of his death.

On his cross examination, the witness said that he had no recollection of being asked by Mr. Clint (of counsel for the defense) on the examining trial if he, witness, knew anything about the dying declarations of the deceased. He denied that in reply to such question he told Mr. Clint that in connection with Doctors Leake and Graham he was attending upon the wounded man, and was not prepared to say anything about dying declarations. He admitted that he did testify at some time during the examining trial that he was not prepared to make any

statement about a dying declaration, but he did not say or intimate that he did not hear any dying declarations. He denied positively that, in answer to a question by Mr. Clint, he testified on the examining trial that his whole attention was directed to the dying man, and that he paid no attention to what was said by him, and that others present might possibly be able to tell him, Clint, what declarations, if any, were made by the dying man. Witness remembered that Mr. Clint asked him on the examining trial what the dying man said, but witness refrained from answering that question because he did not want to tell him, Clint, at that time he, Clint, being an attorney in the case. Witness would not have told any other attorney at that time what he knew about the said declarations. He did not want to reveal his knowledge until he was called to testify on the final trial. The witness could remember the name of but one person who was present when deceased made the declarations stated. That man's name was Menczer. Another person was in the room, but witness could not remember who he was. Doctor Leake came while witness was bending over the deceased, and told witness that he, Leake, was deceased's family physician. Witness at once tendered him the entire charge of the case. Doctor Leake was in the room during the larger part of that afternoon, and was in the room at one or more of the times when the deceased made the statement testified to by witness.

Deceased, when witness first reached him, was lying on the floor in the back room up stairs, at the end of the stair railing, which point was about twenty feet from the head of the stairway. There were three rooms up stairs in that building, connected by ordinary doorways. There was no door in one of those doorways, and witness was not sure that there was one in the other. Quite a number of Jews, including Emil Kahn, the son-in-law of deceased, were in and out of the room on Saturday. Doctor Chapman was also in and out of that room at intervals on Saturday, as he was on Friday after the shooting occurred. Witness was not acquainted with Philip Brown, nor did he know that he was acquainted with Freidenburg, and could not say that either of them was among the persons present in the store on Friday. Witness did not know Wallenstien, and could not say that he saw him with the wounded man on Friday. Doctor George F. Lack, Mr. Beck and Mr. Schiffman were in and out during Friday. The conclusion reached by

the attending physicians was that the wound was necessarily fatal, but witness may have stated to outside parties, immediately after he examined the wound that the result was uncertain. If he did, it was because he did not care to go on record at that time. Moreover, at that time the medical conferees differed in opinion as to the locality of the ball, and until that point was absolutely settled the witness did not want to express a positive opinion.

Doctor E. M. Chapman, Rabbi of the Jewish church in Dallas, of which the deceased was a member, was the next witness for the State. He testified that he reached the deceased soon after he was shot. Deceased was unconscious when the witness reached him, but recovered his consciousness about two and a half hours later. A bed was arranged on a goods box, and, about three hours after the wound was inflicted, the deceased was taken up from the floor and placed on the bed. He at that time appeared to realize his condition, and, in the opinion of the witness, was sane of mind, and he was in that condition when, his wife having left him, he made a statement to witness. The witness asked him no question calculated to lead to any particular statement, but did ask him: "Have you anything to say to me?" The deceased then made a voluntary statement, which the witness wrote on a pocket handkerchief. At this point the witness produced the pocket handkerchief, and declared that the writing thereon was written by him, witness, and that he wrote the words as they fell from the lips of the deceased. This occurred at twenty-five minutes past three o'clock on the afternoon of Friday, the day of the shooting. Directed by the court, the witness read the writing on the handkerchief as follows: "Cahn shot me. He said: 'You must die here or sign these papers. I am desperate without money.'"

On his cross examination the witness said that he reached the deceased between twelve and one o'clock, at which time Doctor Peters was in attendance upon the wounded man. No person was immediately present when deceased made the statement written by witness on the handkerchief, but two or three, whom witness could not recall, were in the room at the extreme end, twenty or twenty-five feet away. The witness was with Benedikt on Friday evening, Friday night, and Saturday, but not Saturday night, and not again until after his death on Sunday. The writing on the handkerchief was not

signed by deceased. The witness did not think the deceased was able to sign it, and did not ask him to; and, moreover, did not regard the signature as necessary. The witness denied that deceased, at any time after he was shot, said, in his, witness's, hearing: "I would not have taken Cahn up stairs if my temper had not got away with me." Before making the statement reduced to writing on the handkerchief by witness, the deceased made a substantially similar statement to Doctor Peters, which Doctor Peters wrote down on a strip of paper. The statement on the handkerchief embodies every word said by deceased to witness about the shooting. He at no time told the witness that if it had not been for his, deceased's, violent temper, the shooting would not have occurred. Witness was with deceased throughout Friday night, but had no recollection of seeing either Wallenstien or Phillip Brown on that night. Two or three young men whose names were unknown to witness were there on Friday night. Witness could not say that Mr. Coulton was or was not one of them. Max Ortlieb was one of the parties who sat up with deceased on Friday night. What talking was done by deceased after he was shot was in a feeble, husky voice, and those to whom he talked bent over him to hear. His words could not be distinguished at any distance.

Doctor H. K. Leake was the next witness for the State. He testified that he was called to attend the deceased, and reached him about an hour after he was shot. He was then lying in a room in the second story of his store at the corner of Elm and Poydras streets. He was shot in the back of the neck. The ball of a large sized pistol entered about an inch to the left of the spine; passed upward and forward until it struck the first bone of the spine, which it shattered to fragments. The post mortem examination of the deceased disclosed several of the fragments of the bone pressing on the spinal marrow. Such a wound would infallibly and instantly knock a man down, and with regard to this case the witness was satisfied that deceased did not and could not have walked a step after receiving the shot. The witness and Doctor Peters attended deceased until his death, which occurred about noon on Sunday—the second day after the wound was inflicted. Witness was not present when deceased died, having left him about ten o'clock. Deceased was perfectly sane of mind during the entire time that witness saw him. He was not unconscious at any time that

witness saw him, but, although in a state of collapse, he was rational and conscious.

S. Schiffman testified, for the State, that he was the proprietor of the jewelry store on Elm street in Dallas, immediately oppo-site the clothing store of M. Benedikt & Co. The shooting of Benedikt occurred a few minutes after twelve o'clock on the twenty-third day of March, 1888. Defendant was in the wit-ness's store about fifteen minutes before the shooting occurred. He was at the witness's store when the witness left, at exactly twelve o'clock, to go to dinner and had then been there perhaps five minutes. He said something about wanting to see Emil Kahn, the son-in-law of the deceased,—that he was waiting there to see Emil Kahn.

Cross examined, the witness said that, at the time of the shooting, he had known the defendant eighteen months or two years. Defendant was not then in business, and was in the habit of calling at the witness's store to chat with witness. When he came to witness's store at noon on the day of the shooting, he said something about his intention of going to Benedikt's store according to an appointment, but witness could not recall his words. The witness observed nothing peculiar about the manner or appearance of the defendant. Deceased and witness had been acquainted about three or three and a half years, and witness was familiar with the deceased's reputa-tion for truth and veracity in the neigborhood of his residence, which reputation was bad. So far as the witness knew, the reputation of the defendant for peace and quietude was good, but witness could not say that he had ever heard his character in that respect discussed. He has heard as many as three people impugn the character of deceased for truth and veracity.

W. N. Coe testified, for the State, that he was a deputy sheriff for Dallas county at the time Benedikt was shot. Witness reached deceased about ten minutes after the shooting. He found Benedikt in the up-stairs back room of his store, lying on the floor, groaning, and apparently suffering great pain. Dr. Leake reached the deceased a short time after the witness did. The witness found, on a box in the room up stairs front-ing on Elm street, a check, a note, a small bottle of Arnold's ink and a pen. He took the check and note away with him, and started off with the pen and ink, but, as he has since been unable to find the said pen and ink, he was unable to say

whether or not he took them away from the store. At this point the State read the note in evidence as follows:

"$100

"DALLAS, TEXAS, Mch. 23, 1888.

"Thirty days after date we promise to pay to the order of L. Cahn one hundred dollars at the bank of Flippen, Adoue & Lobit, Dallas, Texas, with interest from maturity at the rate of ten per cent per annum, and ten per cent additional for attorney's fees in case of legal proceedings to enforce collection. For value received.

"No...... Due......
_____."

The check referred to by the witness was then read in evidence by the State, as follows:

"No....

"DALLAS, TEXAS, March 23, 1888.
"*Flippin, Adoue & Lobit*, Bankers:

"Pay to L. Cahn or bearer one hundred twenty-two and 50-100 dollars.

"$122 50.
_____."

The means by which the witness discovered the said documents were as follows: When he reached deceased, he asked deceased who shot him, and deceased replied: "He told me if I didn't sign those papers he would kill me." The witness went immediately into the room and found the note and check. They were on a box not more than ten feet from the front of the building.

On cross examination the defendant's counsel called the attention of the witness to a publication in the Dallas News of March 24, 1888, which purported to be a statement made by him to a reporter of the said newspaper, about the killing. The witness stated that he presumed he was interviewed by the reporter of that paper. The counsel then read from the said paper the following, which purports to be a part of the witness's said statement to the reporter of the said paper: "I went into the back room and on a table I found the papers (note and check) of which you have copies." With reference to this the

witness stated that he knew it was a box and not a table on which he found the note and check. According to the Dallas News report the witness said: "These are the papers I found on the prisoner." With reference to this, the witness stated that he remembered making no such statement. According to his recollection, he told the News reporter that a policeman arrested defendant. As a matter of fact, witness did not arrest defendant, and took no papers from his person. He found the note and check on the box, as stated. Two or three persons were present when the deceased replied to witness's question, "who shot you?" but witness could not say that Doctor Chapman was one of them, though he saw Doctor Chapman about the store while he, witness, was there. Witness remembered that Benedikt's voice was feeble, but did not remember that he, witness, did or did not stoop over to hear what he said.

Henry Waller testified, for the State, that he was on the Dallas police force at the time Benedikt was killed. He arrested the defendant on Lamar street, the defendant then going from the direction of the Texas & Pacific railroad depot. This was after the shooting, but witness could not tell how long, as he did not hear the shots fired. About the time witness arrested defendant, Policeman Beard came up and asked defendant what he had done with his pistol. Defendant replied that it was in his pocket, and Beard took it from his pocket. The witness observed that some of the chambers of the pistol were empty.

Policeman Dick Beard testified, for the State, that he aided in the arrest of the defendant, and at the time took from him the British bulldog pistol now produced by the witness. Some of the chambers—witness did not remember how many—were empty when he got the pistol from defendant. He did not remember that he examined the pistol to see if it had been recently discharged.

Cross examined, the witness said that the arrest of defendant was made by him and Waller about five minutes after the shooting. Witness did not recollect that, when he arrested defendant, the defendant said that Benedikt "cursed, abused and insulted him, struck him with a stick, and turned to get a box top with which to brain him," and that for that reason he shot Benedikt. Just as Waller arrested defendant, witness asked: "What is the trouble?" and either defendant or Waller replied that it was done "with a pistol," and witness put his

hand in defendant's pocket and got the pistol. Defendant made no statement whatever to witness at the time of the arrest, beyond the fact that he "did it with a pistol"—and it may be that that statement was made by Waller and not by him.

H. L. Hancock was the next witness for the State. He testified that at the time of the shooting of the deceased he was in the employ of the deceased as a salesman in his, deceased's, clothing store, which was situated at the southeast corner of Elm and Poydras streets, in Dallas, Texas. The witness was standing just outside of the front door when the defendant entered that store a few minutes before the shooting. He did not know from which direction the defendant came, as he did not see him until he was in the act of entering the door. As he went in he asked witness if Emil Kahn was in, and went on; but when he reached a point about ten feet inside of the store he turned back and again asked witness if Emil Kahn was in. The witness replied that he did not think he was; that it was his impression that said Kahn had gone to dinner. He then asked witness if Benedikt was in, and witness replied that he was. Defendant then walked on toward the rear of the store. Witness stepped out of the store, and was outside when he heard the firing of a pistol. He thought at the time that the noise was made by somebody striking the sidewalk on Poydras street, and accordingly he looked down Poydras street, but, seeing nothing, and hearing somebody coming down the stairs, he went back to the door. He then saw Mr. Engeldow, a clerk in the store, coming down the stairs. Engeldow called to witness, and about that time defendant came down the stairs with a pistol in his right hand. Four or five minutes after that the witness went up stairs and found Mr. Benedikt lying on the floor, face down, about twelve feet distant from the head of the stairway, his head pointing toward the stairway. The wit ness heard three reports of a pistol. At that time he was standing about eight feet distant from the point immediately under the front up stair room. The up stair room, when witness reached the head of the stair, was filled with smoke that did not issue from the stove, and that smelled of powder.

Examining Mr. Benedikt, the witness found that he had been shot behind the burr of the ear. One of the balls passed through one of the south windows of the room about six feet from the floor. Defendant said nothing to witness when he came down stairs, and made no remark that witness heard as

he passed out of the store. The witness did not see him put up his pistol. Mr. Engeldow and witness were the only persons in the store on the ground floor at the time of the shooting. Engeldow had not got all the way down stairs when the witness started after a policeman. The defendant was in the employ of M. Benedikt & Co. when the witness entered their service in November, 1886, but was not in their employ at the time of the shooting. Emil Kahn was in the employ of M. Benedikt & Co. at the time that defendant was, but he worked in the Globe Clothing House—another establishment that belonged to M. Benedikt & Co. After defendant left the firm, Emil Kahn went to work in the Elm street house. Emil Kahn usually went to his dinner about half past eleven o'clock. It was his custom to leave the store by the front door and go east on Elm street. He could be readily seen leaving the store by anybody standing in the door of Schiffman's jewelry store on the opposite side of the street. The shooting occurred about twenty minutes after twelve o'clock. Emil Kahn got back to the store from his dinner about fifteen minutes after the shooting. The witness was familiar with the handwriting of the defendant, and, upon inspection of the note and check in evidence, declared them to be in the handwriting of the defendant. The witness had seen those papers before this trial, but not on the day of the shooting. He was not in that part of the building where they were said to have been found until some time after the shooting. The window through which one of the balls passed could not be seen by a person standing in any part of that room—the front room in which the check and note were said to have been found—unless he stood immediately in the doorway. The witness had never seen any writing material in that room. The business desk of the establishment was down stairs at the rear end of the store.

On cross examination the witness said that when he entered the employ of Benedikt in November, 1886, the defendant was in the store as bookkeeper and general business manager. He continued to serve the deceased in that capacity until June, 1887. Emil Kahn's usual time of going home to dinner was half-past eleven o'clock, but it was at a somewhat later hour that he left the store to go to dinner on that day. Witness could not state the exact time he left, but it was near twelve o'clock, and it was about a quarter past twelve when defendant entered the store. A person standing at Schiffman's store

would have no difficulty in seeing a person leave Benedikt & Co.'s store on Elm street. The parties who were in Benedikt's store when defendant went in were Messrs. Lee, Engeldow, Benedikt and Lazarus—the latter being a merchant who resided at Plano. Lazarus sometimes bought goods from Benedikt & Co., but witness could not say what, if any, business he was transacting on the day of the shooting. Witness did not know what Lee was then doing in the store. He was not then in the employ of the house, but was on friendly terms with the clerks, and, a short while after the killing of Benedikt. entered the service of the house. He quit working for the house on January 5, 1889. The witness could not indicate the point in the store where Engeldow was when defendant entered the store. If, when he came down stairs after the shooting, the defendant asked witness where he would find a police officer to whom he could surrender, the witness did not hear him. He said nothing whatever at that time that the witness heard, but witness had been informed since the shooting that, as he passed out of the store, the defendant said something to Engeldow about giving himself up. Menczer's saloon was on Poydras street, in the rear of M. Benedikt & Co.'s store, Hodge & Hoya's real estate office intervening. After meeting defendant at the front door, as defendant entered the store, the witness went to Menczer's saloon and got a glass of beer—taking a hat off a dummy figure at the corner of the store as he went. He had just got back to the dummy and replaced the hat when the first shot was fired. The shooting sounded to witness like the pounding of the sidewalk on Poydras street at a point near the barber shop, about one hundred and twenty feet from the corner. Witness stepped to the corner, looked down the street, and then entered the store at the front door, and met Engeldow between the cash drawer—which was about forty feet from the door—and the stairway. Engeldow said that Benedikt had been shot, and told witness to go after a policeman, and witness started off to find one. If, as witness was informed, defendant, when Engeldow told witness to go for a policeman, said: "No, you need not go. I will give myself up," the witness did not hear it. It was after this that witness and Menczer—witness following immediately behind Menczer—went up stairs. Witness did not remain up stairs at that time, but returned immediately to the ground floor, and afterwards went to the jail to see the defendant. Witness was not under the influence of

liquor at the time of the shooting, and had then taken but one glass of beer, and, perhaps, a drink before breakfast on that morning. He drank to some excess on the evening after the shooting. The witness was still in the employ of M. Benedikt & Co. Witness saw no weapon of any kind on or near Benedikt's person, nor did he find any after the shooting when he cleaned the rooms up stairs. He cleaned those rooms about three o'clock on the day of the shooting. A great many persons had been in and out of those rooms before they were cleaned.

Mr. Engeldow testified, for the State, that now and at the time of the shooting, he was in the employ of M. Benedikt & Company, at their clothing store on the corner of Elm and Poydras streets in Dallas. The shooting of M. Benedikt occurred between twelve and one o'clock on March 23, 1888. The witness was in the store when the defendant came in, just before the shooting. Emil Kahn had gone to dinner. Hancock at that time was standing just outside of the front door, and, besides witness and Benedikt, Mr. Lee and Mr. Lazarus of Plano, were in the store. Defendant said nothing to witness as he passed through the store going back to where Benedikt was. Witness did not see the meeting betweenBenedickt and defendant, and heard nothing they said to each other. He saw them go up stairs a few minutes later, and about five minutes after they went up stairs the shooting took place. Three shots were fired, a rustling noise, like somebody running, intervened between each of the said shots. The person appeared to. be running from the front toward the rear of the building. The witness then ran to the head of the sairs and saw Benedikt lying, face down on the floor, and defendant standing over him snapping a pistol. He snapped that pistol at Benedikt's prostrate body as many as two or three times that witness saw. Benedikt at that time was doing nothing but lying on his face. He had no pistol, knife, or other weapon in his hand. Benedikt was never moved from the up stairs of his store until after his death. Witness attended upon him, dressed his wounds and visited him at interyals until his death, and never saw a knife or pistol about him, nor anywhere up stairs.

After discovering defendant and Benedikt in the positions described, the witness went down stairs, and about the time he reached the foot of the stairs, defendant appeared at the head of the stairs, pistol in hand. He came on down and walked

out of the house at the front door with his pistol still in his hand, remarking as he passed witness that he would give himself up. Some time elapsed before the witness went back up stairs, at which time there was no smoke visible. Witness saw but one wound on Benedikt's person, and that was in the back of the neck. He saw what he took to be a bullet hole in one of the south windows. He had never seen that hole before, though he was frequently up stairs and about that window. Benedikt, at the time he was shot, had been back from New York but few days.

On cross examination the witness was asked if he did not know, as a matter of fact, that what he had testified to be the snapping of the pistol at Benedikt's prostrate body, by the defendant, was merely the nervous twitching of the defendant's hands? He replied that he had no such knowledge, and that he did not see defendant's hand move at all. The witness testified on the examining trial of the defendant, but did not recollect whether he then testified about hearing a rustling noise, between the shots, like a person running from the front to the rear of the building. Witness spoke to defendant while he was standing over Benedikt snapping his pistol, but defendant did not respond. After he came down stairs defendant said that he was going to give himself up, but said nothing in the hearing of the witness about having shot Benedikt in self defense. The witness was in the store, five or six feet from the front door, when defendant entered, and was still at that point when the defendant and Benedikt went up stairs. Hancock, a few moments before, was standing outside and in front of the front door. Witness did not know positively where Lee was, but thought he was standing by the stove, fifteen or twenty feet from the foot of the stairs. When defendant and Benedikt went up stairs, Lee was at the foot of the stairs, blacking his shoes. Lazarus was somewhere about the stove with Benedikt when defendant came into the store. Lee entered the service of the house as a clerk in April, after the death of Benedikt.

On his redirect examination the witness stated that the firm's business office was down stairs, and that no writing desk nor writing material was kept up stairs. After the shooting the witness rode to Benedikt's residence in a buggy, and back, and then went into a front room up stairs, in which room, on a box, he saw a small bottle of ink, a pen and some papers. This was before Coe went into the room. He did not

examine the papers, and could not identify them in the check or note now in evidence. The witness had never seen the bottle of ink and the pen prior to that time.

Re-cross-examined, the witness said that his duties kept him at work both up and down stairs. He had charge of the reserve stock up stairs and it was a part of his work to keep that stock arranged. The larger part of his time was spent at work down stairs. No pen and ink was kept up stairs for use in marking goods. A pencil was generally used in marking goods. When it was deemed necessary to use a pen and ink for that purpose, they were taken up stairs from the office, and were taken back to the office afterwards. The bottle of ink witness saw up stairs on the day of and after the shooting was of a very common shape, size and style in general use, but no such a one had ever been about Benedikt's store that witness was aware of. The witness did not know when nor by whom the pen and ink were taken up stairs.

Mr. Lee was the next witness for the State. He testified that he was in Benedikt & Co.'s store, near the office, in the back part of the ground floor of the building, when defendant entered, and he witnessed the meeting between defendant and Benedikt. Mr. Lazarus, of Plano, came to the office a few minutes before defendant did, and entered into conversation with Mr. Benedikt. Lazarus retired a very few minutes after defendant came to the office. Benedikt, who had been back from New York but a few days, and defendant shook hands and exchanged greeting in an apparently friendly and cordial manner. Defendant then said that he wanted to see Benedikt on business. Benedikt said: "All right." Defendant then said: "Let's go up stairs." Benedikt said "all right," and they went up stairs, defendant in advance, and Benedikt following. The witness then left the store, and did not hear the shooting.

On his cross examination this witness stated that it was impossible for him to state how long it was after he left the store that the shooting occurred, except that it was not long. On his way back to town he encountered Emil Kahn, and, referring to the excited movement of people, asked him: "What is all this rush about?" Emil Kahn replied: "The old man is shot."

At the time the shooting occurred, the witness was bill clerk at the Dallas steam laundry, and had been in Dallas since the twenty-sixth day of the preceding November. He went to Benedikt's store on the day of the shooting, about noon, to buy

a pair of pants. He bought those pants from Hancock, a very few minutes after twelve o'clock, put them on, and went to the foot of the stairs to polish his shoes. He was polishing his shoes when defendant came to the office, and when he and Benedikt went up stairs, they passed witness at the foot of the stairs. Witness got through polishing his shoes about the time they passed him, and left the store, went to dinner, and was returning to his work when he was overtaken by Emil Kahn, who was going towards the store. The defendant and Benedikt met near the office, not more than ten or fifteen feet distant from where the witness was. The witness's attention was particularly attracted to the men by the ardor of their greeting—a peculiarity of the Hebrew race. He stopped blacking his shoes and looked at them for a few moments, and resumed work on his shoes about the time they started to go up stairs. Lazarus left within a very few moments after defendant joined Benedikt. Witness remembered nothing said by Lazarus except that he asked Benedikt how he enjoyed his trip east and how he found business in New York. Witness could remember nothing said by defendant or Benedikt before Lazarus left, except that defendant asked Benedikt about the same questions Lazarus did about his trip east. Defendant's counsel asked witness: "When Cahn came in didn't you hear Benedikt say to him: 'Where have you been? I have been hunting all over town for you.' And did not Cahn reply: 'I have been in town but did not know you were in town. I only got your word this morning?' Did not Lazarus about this time say: 'I will come in this evening and see you about getting my goods?'" Witness answered that he heard no such conversation between the parties. The witness went to work for M. Benedikt & Company on April 26, 1888, and remained in their service until January 5, 1889. He was not in the employ of Emil Kahn, but that of M. Benedikt & Company—the firm name under which the business continued to be conducted after the death of M. Benedikt.

The State closed.

Doctor William Lack was the first witness for the defense. He testified that he lived in the city of Dallas, and by profession was a ! arber and chiropodist. He had known the defendant since 1884, and during the year immediately preceding the killing of Benedikt he and defendant had boarded at the same house and taken their meals at the same table. Defendant was

also a regular customer of the witness, having his shaving done at the witness's shop. The witness was familiar with the defendant's reputation for peace and quietude, and knew it to be good. The witness was also well acquainted with M. Benedikt, having known him since his removal to Dallas from Terrell, about two years before his death. They were fellow members of the same Jewish lodge, the witness being president and Benedikt, at the time of his death, vice president of the same. Witness, as such president, detailed members of the lodge to attend Benedikt after he was shot. He detailed Philip Brown and Sam Coulton on Friday night, and Harry Frees and B. Freidenburg on Saturday night. Between three and four o'clock on the afternoon of Thursday—the day preceding the shooting—Benedikt came into witness's barber shop at the St. George Hotel, and asked witness if he had recently seen defendant, and if defendant was in town. Witness replied that defendant was in town, when Benedikt said: "He has been dunning me for money. I want you to tell him when you see him that I have been looking for him." When witness went to his boarding house that evening he met defendant and delivered Benedikt's message, but did not repeat to him Benedikt's statement about defendant dunning him. The witness knew as a matter of fact that defendant carried a pistol on his person for some time prior to the killing of Benedikt, and it was commonly and generally known that one Heidingsfelder who, at one time clerked for M. Benedikt & Co., had repeatedly uttered threats against the life of defendant. Defendant, to witness's knowledge, knew of those threats. The witness, for one, told him about them.

On cross examination by the special counsel for the prosecution, the witness said that as a professional chiropodist he was a doctor of sore feet, ingrowing nails and corns. The Jewish lodge, of which the witness and Benedikt were members at the time of the latter's death, and of which they were respectively president and vice president, was known as "Brith Abraham." Witness's barber shop and chiropodist office was in the St. George Hotel. It was reached by passing through the main office of the said hotel. Witness's shop contained three barber chairs, but at the time of the killing he had but one tonsorial assistant, whose name he could not remember. He was a white man, and, like barbers, a "roustabout"—that is, a man who often changes his place of work and residence. No per-

son was in witness's shop when Benedikt came in and shaved
on the day before he was shot. Mr. Benedikt was a regular
Saturday evening customer. In the conversation on that eve-
ning Benedikt said that he had been to his old "Globe" clothing
house looking for defendant. If he mentioned any other place
to which he had been, witness did not remember it. He did
not say when he inquired at the "Globe" for defendant. He
did not say when defendant dunned him for money, but merely
that defendant had been dunning him, and that he had been
looking for defendant. Witness told defendant at the dining
table, at their boarding house, that Benedikt had been to his
shop looking for him, defendant, and had asked him, witness,
to tell him, defendant, that he, Benedikt, was looking for him,
and wanted him to come to the store. Witness could not re-
member that any person other than himself and defendant was
then at the table. Another or others may or may not have
been sitting at the table. Heidingsfelder's threat, uttered in
the hearing of the witness, occurred in this wise: It was gen-
erally known that hard feelings were entertained by Heidings-
felder against defendant, and it was generally discussed by the
several persons at the dining table of the house where, defend-
ant boarded. Meeting Heidingsfelder on Elm street one day,
the witness remarked: "I hear you have been having a little
fun; that you have been let out of the Globe house," He re-
plied: "Yes, I am going to get square with the son-of-a-bitch."
The witness did not personally repeat to defendant this threat
of Benedikt, but he, defendant, was at the boarding house
where all the boarders were talking about it.

M. Staum testified, for the defense, that he clerked for M.
Benedikt & Co. for the nineteen months preceding February 1,
1888, on which date they sold out the "Globe" clothing house.
During those nineteen months witness worked first at the "Syn-
dicate" or Elm street house of Benedict & Co., and then at the
"Globe" house, and continued to work at the latter after the
said sale. Witness saw Benedikt on the morning of and before
the shooting occurred. He came into the Globe about eight
o'clock on that morning and asked witness: "Did you see
your old friend this morning?" Witness asked him: "Who
do you mean?" He replied: "Leo Cahn." Witness said in
reply: "It is yet too early for him. He usually comes here, but
not this early." Benedikt then said to the witness: "If you
see him tell him that I would like to see him about noon." He

spoke in a somewhat rapid and excited manner. The defendant came to the "Globe" store between ten and eleven o'clock, and witness told him that Benedikt had said he wanted to see him about noon. The witness and one Heidingsfelder were fellow clerks in the service of M. Benedikt & Co. at one time, and at that time the defendant was the general manager of M. Benedikt & Co.'s business, and was also book keeper and "confidential man." Defendant quit Benedikt & Co. in 1887, and went to New York for somebody, but witness could not now say for whom. He owned a pistol at the time he quit the service of Benedikt & Co. He had been warned and cautioned to be at all times prepared to defend himself against Heidingsfelder, who at various times had uttered threats against his life. During the absence of defendant in 1887, Heidingsfelder said to witness: "If Cahn ever comes back here from New York and I see him, I will kill the bastard son of a bitch!" The witness communicated that threat to the defendant as soon as he got back, and warned him to be at all times prepared to defend himself. Defendant's reputation for peace and quietude had always been good.

Cross examined, the witness said that the conversation with Heidingsfelder referred to in the examination in chief occurred on Elm street in Dallas. The witness could not remember that Doctor Lack or anybody else was present. In addition to the threat to kill the "bastard son of a bitch," etc., Heidingsfelder said something about defendant having talked about him to Benedikt and about having uttered threats against him, Heidingsfelder. Emil Kahn was manager of the Globe clothing house in the winter of 1887, when witness and Heidingsfelder were clerking there. When defendant came into the Globe house on the morning of the shooting, the witness, after delivering Benedikt's message to him, advised him not to go to the store in response to the invitation. Witness thought some of the clerks in the Globe store heard this conversation, but was not certain. A man named Michaels, who clerked in the Globe house at the the time, but who was now supposed to be in San Antonio, was present when witness told defendant, on his return from New York, of the threats of Heidingsfelder, and advised him to be prepared to defend himself. Defendant bought a pistol in March or April, 1887, which was previous to any threats by Heidingsfelder that witness had any knowledge of.

S. Lazarus testified, for the defense, that he lived in the town

of Plano, where he was engaged in the mercantile business. Witness was in Dallas on March 23, 1888, and about noon that day went to the clothing store of M. Benedikt & Co., corner of Elm and Poydras streets, to buy a bill of goods if he could get them on suitable terms. He went to the back part of the store, near the stove, where he met Benedikt whom he had not seen since his return, a few days before, from New York. Within five or ten minutes defendant entered the store, came to where witness and Benedikt were, saluted both and entered into a conversation with Benedikt. Benedikt told defendant that he had been looking or waiting for him for three or four days: Defendant replied: "I heard you wanted to see me, but I did not know until last night that you were here." They continued to talk, but in so low a tone that witness, who made no attempt to listen, heard nothing they said. He understood enough to know that they were discussing business matters, and accordingly he turned to leave the store. Just as the witness started to leave, Benedikt said to defendant: "I want to see you up stairs." Witness then left, remarking to Benedikt that he would return after dinner.

On his cross examination, the witness said that he was acquainted with Lee, the man who entered the service of Benedikt & Co. after the death of Benedikt, but he did not know him at the time of the shooting. He did not see Lee in Benedikt's store on the day of the shooting. He did not see anybody but defendant come into Benedikt's store while he, witness, was there, and he at no time observed a man at the foot of the stairs blacking his shoes. The witness was satisfied that, if a man had been at the foot of the stairs blacking his shoes at the time defendant joined witness and Benedikt near the stove, he would have seen him. The witness did not see Benedikt and defendant go up stairs, but, just as he left the store, he heard Benedikt propose to defendant to go up stairs. Witness did not, on the day previous to this testimony, tell Lee that he, witness, left the store before Benedikt and defendant went up stairs. Benedikt did not tell defendant, in the presence of witness, why or for what he had been looking for defendant.

O. P. S. Fee was next introduced by the defense. He testified that he had known deceased between twelve and fifteen years, during which time his reputation for truth and veracity was good. At this point defendant asked the witness: "Have not you stated on the streets forty dozen times that Benedikt's

reputation for truth was notoriously bad?" Upon the State's objection the question was ruled out.

Henry Waller, recalled, testified, for the defense, that he arrested defendant on Lamar street, which was beyond Elm street from the court house. He was then going down the middle of the said Lamar street towards Main street, from the direction of the Texas & Pacific railway depot. The point on Lamar street where the witness arrested defendant was about five hundred feet distant from M. Benedikt & Co.'s store, where the shooting was said to have occurred. To get to that point from the said store, the defendant would have traveled westwardly on Elm street to Lamar street, and then north along Lamar street, and in doing so he would have traversed crowded business thoroughfares. It was between twelve noon and one o'clock p. m., when the arrest was made. Witness did not hear the shooting and could not tell how long after the shooting it was that he arrested defendant. He, witness, was summoned from Main street, and, as he passed E. M. Kahn's establishment, somebody exclaimed: "Yonder he is, coming this way!" Beard appeared about the time witness arrested defendant, and Beard secured defendant's pistol, which the witness did not examine.

William Wallenstien testified, for the defense, that he reached the deceased about two hours after he received his wound and spent three or four hours with him that afternoon. He sat up with Benedikt on Saturday night, on which night Benedikt made statements to him in regard to the shooting. He said the defendant applied to him for money; that he had no money in the safe when defendant asked him to sign a check, but that, having no money in bank at that time, he refused; that, if he had known that defendant was armed with a pistol, he would not have struck defendant with a board; that he was trying to get a board to strike defendant when he was shot; that he had known defendant a long time and regarded him as an arrant coward, and had no idea that he would shoot.

On cross examination the witness said that he remained with Benedikt from seven o'clock on Saturday evening until seven o'clock on Sunday morning. It was about eleven o'clock on Saturday night that Benedikt made the statement detailed by the witness on his examination in chief. Messrs. Friedenburg and Harry Frees also spent Saturday night with Benedikt, but witness did not know whether or not they heard the statement

made to witness by Benedikt. Mr. Benedikt called the witness to his bed side and made the said statement to him. The substance of that statement was that defendant first asked him for money, and then to sign a check; that he struck the defendant, and then attempted to get a board to strike him again, when defendant shot him; that he was sorry he struck him; that he would not have done so had he known that defendant had a pistol, and that he thought the defendant was too great a coward to shoot. He talked loud enough for witness to hear him, and witness would "guess" that others heard him. The witness did not remember to whom, if to anybody, he talked about this matter. In fact he tried to keep his knowledge secret, as he did not wish to be mixed up in this affair. Benedikt told witness that he owed the defendant some money, but did not say how much, nor how long he had owed it.

Mr. Friedenburg testified, for the defense, that he was one of the parties appointed by the Hebrew lodge to wait upon Benedikt on Saturday night. The gentlemen who served with him on that night were Mr. Wallenstien and Harry Frees. Benedikt talked to Wallenstien and witness, on Saturday night about the shooting. He said, in substance, that he very much regretted the occurrence, and that if he had known defendant was armed he would not have struck him. He said other things on that night, but witness did not remember them. On his cross examination the witness said that he thought he was alone in the room with Benedikt when the said statement was made, Frees and Wallenstien having stepped out of the room a few moments before. It was quite probable that the witness had told several parties about Benedikt's said declarations, but he could not recall the names of any of those parties. As a matter of fact witness had told several parties about it, but he could not name one. Witness did not remember that Wallenstien had ever told him of a declaration made to him, Wallenstien, by the deceased.

Philip Brown testified, for the defense, that he was a member of the Brith Abraham lodge, and was detailed to attend Benedikt on Friday night. Coulton, the other member detailed with the witness, and the witness went to the room where Benedikt was between seven and eight o'clock on that night. During that night deceased said to witness: "If I had not called Cahn up stairs this would not have happened. I struck Cahn, and turned around to pick up a piece of box board when

he shot me." Cross examined, the witness said that Sam Coul-
ton was in the room when Benedikt made the said statement
to witness. Benedikt made other statements about the shoot-
ing, among them that he would certainly die. Witness could
repeat nothing else. Detailing the statement referred to, wit-
ness said that, waking from a short sleep, deceased exclaimed:
"O, me! If I had not called Cahn up stairs, this would not
have happened." A moment later he continued: "He (Cahn)
told me about the money I owed him, and I got mad and struck
him, and then turned to pick up a board and he shot me." He
did not say how much money he owed defendant, nor did he
say what he struck Cahn with. Witness repeated this state-
ment to several parties,—among them to Dr. Lack. He told
Lack on the next day, or the day after. Witness did not know
whether or not Emil Kahn was present when Benedikt made
the said statements to him. Witness remembered seeing no
other person than those mentioned on that night. Emil Kahn
remained at the store with Benedikt but a short time on the
said Friday night.

Dr. A. C. Graham testified, for the defense, that he reached
Benedikt about two hours after he received the wound on Fri-
day, and remained with him three or four hours. He saw Ben-
edikt again on Saturday, and again on Sunday, a few hours
before he died. The witness at no time heard Benedikt speak
of the shooting. He did not talk about it while witness was
with him.

Albert Hurst testified, for the defense, that Benedikt was a
taller man than defendant, and would weigh thirty or thirty-
five pounds more than defendant. He was a heavy built, and
apparently a strong man. On cross examination, the witness
said that he competed in business with deceased, but denied
that, after the killing, he circulated a petition among the
Hebrews of Dallas to destroy Benedikt's reputation for truth
and veracity. He did not hunt witnesses for the defendant.
He talked to Ben Iralson, but only with the view of obtaining
information to satisfy his personal curiosity in the matter.
The witness never heard of a petition for the discovery of wit-
nesses to impeach Benedikt's character for truth and veracity
being circulated.

Three or four other witnesses testified, for the defense, that
deceased was a compactly built, strong man, weighing from

one hundred and sixty-five to one hundred and eighty pounds—a much heavier man than defendant.

Max Kellar testified that, by employment of Emil Kahn, he waited upon Benedikt from Saturday morning until his death, during which time Benedikt made no statement whatever about the shooting in the hearing of the witness. Witness first saw Benedikt after the shooting, on Friday night.

Messrs. Franks, Starke, Sligh, Record, Meyer, Davis and Gunter, testifying for the defense, declared that the general reputation of M. Benedikt for truth and veracity was bad. Doctor Schiff testified that Benedikt was generally reputed to be an irritable, excitable and violent man, while defendant had always been esteemed as a peaceable man.

Defense closed.

W. H. Flippin was the State's first witness in rebuttal. He testified that he was the senior member of the firm of Flippin, Adoue & Lobit, bankers, Dallas, Texas. His attention was called to the following promissory note:

"$400.                                    June 2, 1887.

"On Dec. 15, we promise to pay to the order of L. Cahn four hundred dollars at Flippen, Adoue & Lobits, bankers, Dallas. Value received.

"No.——.   Due Dec. 18.                 M. Benedikt & Co."

Endorsed across the face: "Paid 12–17–87." Endorsed on the back: "L. Cahn." "Paid 12–17–87. Flippin, Adoue & Lobit, per W. M. Perry, collector."

The witness identified the signature "M. Benedikt & Co.," as genuine, and as the handwriting of M. Benedikt. He did not know that Benedikt & Company had money on deposit at the bank of Flippin, Adoue & Lobit, on March 23, 1888, but the check of Benedikt & Company for four or five hundred dollars would have been cashed at said bank at that time. The promissory note of June 2, 1887—the note in evidence—was discounted at the witness's bank, and the bank's signature of December 17, 1887, shows that it was paid on that day. At this point the following receipt was exhibited to witness and put in evidence:

"Dallas, June 2, 1887.

"Received from M. Benedikt & Co., the sum of four hundred dollars in note, and in book account of L. Cahn, of four hun-

dred and ninety-three, which amount is full and complete set-
tlement to date for any demand whatsoever, and for services
rendered to the firm of M. Benedikt & Co.

"Book, $493.

"Note, $400.

―――――

"$893.                                            L. Cahn."

The witness identified the signature as the genuine signature
of the defendant.

On cross examination, this witness stated that, so far as he
knew, the reputation of Benedikt for truth and veracity was
good. It was good with the witness.

M. L. Hancock, recalled by the State, testified, in rebuttal,
that he saw no blood or other evidence of a struggle about the
person of defendant when the latter came down stairs just
after the shooting. He did not afterwards find any planks or
box boards, or other boards, up stairs displaced. There were
no boards up stairs accessible that could be used to knock a
man down with. Clothing was piled three feet high on all of
the boxes save one, which was kept under a counter, and there
was no top to that box. The boxes that had tops were nailed
up.

Mr. Engeldow testified for the State, in rebuttal, that he saw
no blood, bruise or other indication of violence on the person
of defendant when he was snapping his pistol at Benedikt, nor
after he came down stairs. Witness at no time saw any box
tops or other kind of plank or boards lying about the floor or
elsewhere up stairs, at the time nor after he saw defendant
snapping his pistol at Benedikt.

Mr. Coe testified that when he went up stairs, soon after the
shooting, he hunted for weapons but found none, nor did he
see any box tops, plank, boards or scantling.

Officers Waller and Beard testified, for the State, that they
observed no blood, bruises or indications of recent violence on
the person of defendant when they arrested him.

Messrs. Friedlander, Kingdon, Jones and Hynson, testifying
for the State in rebuttal, stated that Benedikt's reputation for
truth and veracity was good.

The State closed.

M. L. Hancock was recalled by the defense, and in reply to
questions propounded to him, said that if defendant was ever

in the employ of Benedikt after June 2, 1887, he, witness, did not know it; that if the defendant went to New York to transact business for Benedikt & Co. after June 2, 1887, he, witness, did not know it; and that if the defendant purchased goods in New York for Benedikt & Co. he, witness, did not know it. The several articles of merchandise noted in the note book now exhibited to witness by defendant's counsel, were entered in Benedikt's handwriting, but if such articles were shipped by defendant from New York, and after June 2, 1887, were received by Benedikt & Co., witness did not know it. The entry in the note book was unsigned, and appeared to be a memorandum and not an order for goods.

On cross examination, the witness said that he knew the defendant to be indebted to M. Benedikt & Co. on January 18, 1888. Benedikt had entrusted to defendant for sale through the country a quantity of jewelry, and on the said January 18, asked him for a settlement. Defendant replied to Benedikt that he could not settle, as he had sold the goods on credit. Benedikt then asked him for a partial payment. Defendant replied to him: "You know damned well that I have sold the goods on credit and received no money for them." Witness heard no particular sum of money mentioned in that conversation. The witness knew nothing whatever about Benedikt's estate owing defendant a debt of two hundred and fifty dollars, secured by a lien on a house.

The defendant's special instruction number thirteen, referred to in the eighth head note of this report, reads as follows: "The defendant was justified in shooting Benedikt if in so doing he acted upon reasonable appearances of danger of death or of serious bodily injury to himself, which reasonable appearances the jury must consider and determine from Cahn's standpoint. It matters not in such case whether the danger was real, whether it in fact existed, or whether it was merely colorable. If from defendant's standpoint, taking into consideration all the circumstances of the case, amongst others the relative size of the men, it would reasonably appear to him that he was in danger of death or serious bodily injury from Benedikt, he had the right to kill him, although in fact such danger did not exist. Each juror must place himself in the place of the defendant, and determine from all the facts as they appeared to him at the time, whether his apprehension or

fear of death or of serious bodily harm was reasonable; and if so you must acquit him."

The substance of special instructions fourteen and fifteen, referred to in the same head note, is stated as follows by the counsel for the defense: "The right of self defense having once accrued, it exists and continues until the danger, or threatened danger, which authorizes its exercise, is past. It must not be carried beyond the point necessary to secure defendant's safety, but the jury must place themselves in defendant's place and judge of the necessity from his standpoint, taking into consideration all the facts and circumstances and surroundings as they appeared to him at the time, and in this connection the jury may consider the sizes and strength of the two men. Even if the defendant carried his attack upon the deceased beyond the point necessary to his own safety; if he did it under the influence of sudden excitement or passion, produced by the assault against which he was defending himself and against which he had a legal right to defend himself, the killing would not be murder, but manslaughter, and the jury should so find if they believe that defendant went further than was necessary for his own defense; and upon this question he is entitled to the benefit of the reasonable doubt."

*C. F. Clint, J. W. Thompson, D. G. Wooten* and *R. B. Seay,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. With respect to the organization of the jury, the defendant assigns the following errors, each of which is presented by proper bill of exception, to wit:

1. The court erred in organizing the jury and in impaneling the same in the following particulars, to wit: In not granting appellant's motion to compel, by proper process, the presence of the seventeen absent jurors who had been drawn to serve on the regular special venire, and whose names appeared upon the list of said venire served upon defendant, before proceeding to form the jury, or compelling the appellant to select a jury from among the thirty-three special veniremen who alone, out of the sixty named in the list of the special venire, appeared and were present to be selected from.

2. The court erred in overruling appellant's motion to com-

pel, by proper process, the attendance of the aforesaid seventeen absent jurors, respectively, as their names were reached on the list and called, or to postpone the further formation of the jury until their presence could be secured.

3. The court erred in not granting appellant's motion to compel, by proper process, the attendance and presence of said seventeen absent jurors, after the thirty-three, who were in attendance, had been exhausted and only four jurors selected, before proceeding further with the formation of the jury, and in not postponing the formation of the jury until the absent jurors could be procured or their absence accounted for, but in at once issuing a special venire for talesmen.

4. The court erred in refusing appellant's motion to call in the regular panel of jurors for the week, who had been regularly drawn by the jury commissioners of the county, after the special venire had been exhausted, and before issuing a venire for talesmen, because, under the law relating to the formation of juries in capital cases, the defendant is entitled to have all the jurors who have been drawn by the jury commissioners first placed in the box to be selected from, before ordering a venire of talesmen from the body of the county; and because the special venire ordered for the trial of this case was incomplete in that only thirty-three of the sixty special veniremen were present, though duly summoned to attend, and defendant's motions to compel their attendance had been overruled, and in such case the regular panel for the week should have been first placed in the box and drawn from before the issuance of a venire for talesmen.

Each of said assignments of error is fully sustained by the record, and is fatal to the legality of this conviction. We shall not consume much time in discussing these errors, as former decisions and statutory provisions make them manifest. We call to the attention of the trial judge to Osborne v. The State, 23 Texas Court of Appeal, 431; Weaver v. The State, 19 Texas Court of Appeal, 547; Thuston v. The State, 18 Texas Court of Appeals, 26.

As to the dying declaration of the deceased, we do not think there was error in admitting them. A sufficient predicate for their admission seems to have been established.

It was not error to refuse to permit the witness Waller to testify to what defendant said about how and why he killed the

deceased. These statements of defendant were not made under circumstances constituting them *res gestae*, and were inadmissible.

It was not error to permit the State to read in evidence the receipt dated June, 1887, and the note of the same date for four hundred dollars. These documents were relevant, tending to throw light upon the business relations of the defendant and the deceased, and to show that the deceased was not indebted to the defendant, as claimed by the latter. It was within the discretion of the court to admit this evidence in rebuttal, and we think the court properly admitted it when so offered.

There was no error in refusing to require Emil Kahn to disclose to the defendant or his counsel what facts he would testify to. . (Withers v. The State, 23 Texas Ct. Ap., 396.)

Numerous exceptions were reserved by the defendant to the charge of the court, and numerous special instructions were requested by the defendant, which the court refused to give, and defendant excepted. We shall not undertake to discuss each of the objections urged to the charge, but will merely, in a general way and briefly, state our conclusions.

1. The definition of malice given in the charge is not correct. There may be "a settled purpose or intention to seriously injure or destroy another," and yet no malice may exist in the mind of the person entertaining such purpose or intent, as in the case of a sheriff who executes a death warrant, or as in the case of a person who commits justifiable homicide in self defense. (Bramlette v. The State, 21 Texas Ct. App., 611; Harris v. The State, 8 Texas Ct. App., 90; McKinney v. The State, Id., 626; Pickens v. The State, 13 Texas Ct. App., 353; Hayes v. The State, 14 Texas Ct. App., 330.)

2. With respect to self defense, the court should, in view of the evidence, have instructed the jury that if the defendant provoked the contest with the deceased, but not with the intention of killing or doing him serious bodily injury, he would not by such provocation be wholly deprived of the right of self defense, but that in such case self defense might be availed of by him to the extent of reducing the degree of the homicide to a grade less than murder. (White v. The State, 23 Texas Ct., App., 154; Roach v. The State, 21 Texas Ct. App., 249; Thuston v. The State, Id., 245.)

3. We think the special instructions numbers thirteen,

fourteen and fifteen, requested by the defendant, are applicable to and demanded by the evidence, and are correct in principle. They are a part of the law of the case, and it was material error to refuse them.

In other respects in which objections are urged to the charge, and to the refusal to give requested instructions, we hold no error was committed.

We will here take occasion to make some suggestions in regard to the preparation of cases for appeal. It is very desirable that a transcript on appeal should contain only such matter as is essential to an intelligible consideration and determination of the questions involved in the case, and this essential matter should not be unnecessarily repeated. Thus, where an application for a continuance has been overruled, and the defendant has excepted to the ruling, it is only necessary that the application should be inserted *once* in the transcript. Where the bill of exception sets out the application in full, it will be sufficient to insert the bill. So, it is unnecessary to except to the action of the court in overruling exceptions to an indictment, or in overruling a motion in arrest of judgment, or for a new trial, and the transcript should not be encumbered with exceptions of this kind. So, in the preparation of a statement of facts immaterial matter should be excluded. Only the material facts should be inserted, and as succinctly and clearly as practicable. Stenographic reports of the evidence, containing questions and answers, remarks of the reporter, etc., detailing every word spoken by the witnesses, as well as the remarks of court and counsel, should not be certified as a statement of facts.

We are induced to make these suggestions because of the unnecessary voluminous transcript in this case. It is a transcript covering five hundred and thirty-seven pages, when, in our judgment, if the case had been carefully and properly prepared for appeal, the transcript would not have exceeded one hundred pages. The statement of facts, furnished we presume by a stenographer, cover over two hundred pages, when every material fact proved on the trial could, we think, have been presented in a statement of thirty pages. Such voluminous, unwieldy transcripts require of this court much useless labor, and the consumption of valuable time, and frequently obscure the merits of the case. A very little care on the part of the coun-

sel and the court in the preparation of cases for appeal, would relieve this court of a vast amount of unnecessary labor, and enable us to more readily and intelligibly dispose of causes.

Because of errors we have mentioned, the judgment is reversed and the cause remanded.

*Reversed and remanded.*